**Brenda SCHIESSER, Petitioner,**

v.

**The STATE of Texas, Respondent.**

**No. B–5857.**

Supreme Court of Texas.

Dec. 1, 1976.

James C. Henry, III, Martin J. Grimm, Houston, for petitioner.

Sara B. McIntosh, Asst. Dist. Atty., Houston, for respondent.

SAM D. JOHNSON, Justice.

The Harris County Child Welfare Unit instituted this suit for termination of the parent-child relationship between the parents, Brenda Shadowens Schiesser and Freddie Shadowens, and their three children under Section 15.02 of the Texas Family Code Annotated.[1] The juvenile court

---

1. Section 15.02, Texas Family Code Annotated, originally enacted in 1973 was amended effective September 1, 1975. The references herein

to Section 15.02 pertain to the statute enacted in 1973. Section 15.02 provided in part:

"A petition requesting termination of the parent-child relationship with respect to a parent

terminated the relationship and appointed the Welfare Unit as managing conservator. Freddie Shadowens did not appeal. The court of civil appeals affirmed. 531 S.W.2d 922. We reverse and remand for new trial in the interest of justice.

The record herein in no way lends itself to clarity or, in some instances, to understanding. No complete chronology of events has been submitted.[2] The pertinent events appear to be as follows:

In July 1973 the Welfare Unit filed a petition in the juvenile court of Harris County, Texas alleging that these three children had been placed in its custody on June 28, 1972, that at that time the children were in need of medical attention and dependent upon neighbors for food, that the children had remained with the Welfare Unit, and that Brenda had been unable to formulate a child care plan. The petition requested that the Welfare Unit retain custody pending a final hearing and that the parent-child relationship be terminated.

On November 13, 1973 an amended petition was filed. It alleged that Brenda had not cooperated with the Welfare Unit, that she had been unable to formulate an adequate child care plan, and that the whereabouts of Freddie Shadowens were unknown.

A year later, November 7, 1974, the Welfare Unit moved to dismiss this amended petition[3] on the basis of a recommendation by Beth Stephenson, a case worker at the Welfare Unit. Her recommendation was based on the following facts: since April 1974 Brenda had requested monthly visits;

---

who is not the petitioner may be granted if the court finds that:

"(1) the parent has:

". . .

"(B) voluntarily left the child alone or in the possession of another not the parent without expressing an intent to return, without providing for the adequate support of the child, and remained away for a period of at least three months; or

". . .

"(D) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child; or

"(E) failed to support the child in accordance with his ability during a period of one year ending within six months of the date of the filing of the petition;

". . . and

"(2) termination is in the best interest of the child."

2. The following is the most accurate chronological summary of the confusing events which may be gleaned from the record:

June 28, 1972: Children placed in custody of Harris County Child Welfare Unit.

February 15, 1973: Temporary custody in Cause No. 27431 inadvertently dismissed.

July 23, 1973: Petition filed requesting termination of parental rights. Cause No. 30523.

August 27, 1973: Temporary custody awarded to Welfare Unit.

November 13, 1973: Amended petition filed requesting termination of parental rights.

November 13, 1973: Hearing on amended petition set for January 3, 1974.

January 3, 1974: Hearing reset for April 3, 1974.

April 3, 1974: Agreed order declaring children dependent and neglected; Welfare Unit appointed as managing conservator; hearing set for October 7, 1974.

October 7, 1974: Hearing reset for November 7, 1974.

November 7, 1974: Welfare Unit filed motion to dismiss.

November 15, 1974: Children returned to the mother.

November 20, 1974: Children returned to Welfare Unit at mother's request.

December 30, 1974: Amended petition filed requesting termination of parental rights.

January 3, 1975: Entry of order dismissing petition pursuant to November 7, 1974 motion by the Welfare Unit.

January 10, 1975: Motion filed to set aside dismissal order of January 3, 1975 and reinstate temporary custody order.

January 14, 1975: Motion of January 10, 1975 granted.

January 14, 1975: Hearing set for February 20, 1975.

January 23, 1975: Motion filed to set aside dismissal order of January 3, 1975 and reinstate managing conservator order.

January 30, 1975: Motion filed January 23, 1975 granted.

February 20, 1975: Hearing reset for March 11, 1975.

March 11, 1975: Hearing.

March 31, 1975: Entry of court decree terminating parent-child relationship and appointing Welfare Unit as managing conservator.

3. Apparently this motion to dismiss was granted on November 7, 1974 although the order dismissing Cause No. 30523 was not signed and entered until January 3, 1975.

she had been very cooperative with the Welfare Unit; and she appeared able to offer proper care and a stable home for her children. During 1974 Brenda had obtained a divorce from Freddie Shadowens and continued to live with William Schiesser with whom she had lived since 1973.

On November 15, 1974 the Welfare Unit returned the children to Brenda at the home of William Schiesser. Five days later, on November 20, 1974, Brenda phoned Beth Stephenson at the Welfare Unit and requested that she remove the children from the home that day. Brenda maintained that she had no choice but to request the removal as William Schiesser insisted that the children leave but refused to allow her to leave. She also stated that she did not want her children to leave.

In her testimony Beth Stephenson related that she spoke with William Schiesser and Brenda on this day, November 20, 1974, and described them as appearing angry. She also stated that William Schiesser informed her that he wanted the children to leave because he could not afford to provide for them and because they were disturbing the family situation. She further testified that Brenda and William were "yelling" at each other when she came for the children. The children returned with Beth Stephenson to the Welfare Unit.

The Welfare Unit, on December 30, 1974, filed a second amended petition alleging that in April 1974 the children had been declared dependent and neglected,[4] that Freddie Shadowens had "failed to support the child[ren] in accordance with his ability during a period of one year ending within six months of the filing of the petition" [Section 15.02(1)(E)], and that Brenda had "engaged in conduct or knowingly placed the child[ren] with persons who engaged in conduct which endanger[ed] the physical or emotional well-being of the child[ren]" [Section 15.02(1)(D)]. It should be noted that the allegation contained in this second amended petition that Brenda had endangered the physical or emotional well-being

of the children was not contained in the finding of facts filed by the juvenile court. Instead, the juvenile court found that the elements of a different Section, Section 15.-02(1)(B), existed:

1. "Brenda Shadowens Schiesser voluntarily left Thomas, Karen and Kenneth Shadowens in the possession of Harris County Child Welfare Unit and expressed no intent to return";

2. "Thomas, Karen and Kenneth Shadowens were left by Brenda Shadowens Schiesser in the possession of Harris County Child Welfare Unit for 3 months, namely, part of November, December 1975 [sic], January and part of February, 1975"; and

3. "Thomas, Karen and Kenneth were supported and provided for by the Harris County Child Welfare Unit for 3 months."

It should also be noted that although the second amended petition did not contain an allegation that termination of the parent-child relationship was in the best interest of the children, the juvenile court made such a finding of fact.

On January 3, 1975, pursuant to the November 7, 1974 motion to dismiss of the Welfare Unit, the court entered an order dismissing the petition. A week later, on January 14, 1975, the Welfare Unit moved to set aside this dismissal order and the motion was granted on this same date.

During January 1975 Brenda left William Schiesser and stayed at a motel for four days. Brenda returned to his home and married him later that month.

For the first time since November 1974 William Schiesser and Brenda visited the children in February 1975. Brenda testified that this was the first time the Welfare Unit had allowed her to see her children. Under the order entered on January 30, 1975 by the juvenile court setting aside the dismissal, the Welfare Unit was reinstated as the temporary managing conservator of the children. Consequently, the Welfare

---

4. Apparently, Brenda agreed to the designation of her children as "dependent and neglected."

Unit had control over visitation of the children by Brenda [Section 14.02].[5]

Kathy Gaber, the Welfare Unit worker assigned to this case as of January 1975, testified that Brenda expressed to her the desire for the return of the children and that William had indicated that he wanted to adopt them. Her testimony included the additional information that she had not received any phone calls from either of them since the February 1975 visit. She further testified that Brenda had not mistreated the children.

The decree in issue in this case is that of March 31, 1975. It was on that date that the juvenile court appointed the Welfare Unit as managing conservator and, with respect to Brenda, ordered termination of the parent-child relationship under Section 15.02 on the grounds that she had "voluntarily left the child[ren] . . . in the possession of another not the parent without expressing an intent to return, without providing for the adequate support of the child[ren], and remained away for a period of at least three months" [Section 15.-02(1)(B)]; and that the "termination [of the parent-child relationship was] in the best interest of the child[ren]" [Section 15.02(2)]. It is to be noted that the pleadings relied upon alleged Section 15.02(1)(D) [conduct which endangers the children] as a basis for termination. The findings of fact by the juvenile court indicate that it relied on Section 15.02(1)(B) [voluntarily left the children without expressing an intent to return] as a basis for termination. Such variance has not been made an issue before this court. Similarly, the failure of the Welfare Unit to allege that termination of the parent-child relationship was in the best interest of the children has not been made an issue in this case.[6]

A preliminary matter which must be disposed of is the Welfare Unit's motion to dismiss the appeal because of mootness.[7] The documents in support of such motion reveal the most lamentable aspect of this case. An affidavit by the attorney of record of the Welfare Unit states that the three children were adopted on February 4, 1976 in a proceeding in Juvenile Court No. 1, Harris County. The juvenile court found that the three children had lived for at least

---

5. Chapter 14, Texas Family Code Annotated, originally enacted in 1973 was amended effective September 1, 1975. The references herein to Chapter 14 pertain to the statute enacted in 1973. Section 14.02 provided in part:

"(b) A managing conservator who is not the parent of the child has the following rights, privileges, duties, and powers, subject to the rights, privileges, duties, and powers of a possessory conservator as provided in Section 14.04 of this code and to any limitation imposed by court order in allowing access to the child:
"(1) the right to have physical possession of the child and to establish its legal domicile;
"(2) the duty of care, control, protection, moral and religious training, and reasonable discipline of the child; . . ."

6. The juvenile court made a finding that termination was in the best interest of the children.

7. The following is the most accurate chronological summary of the confusing events leading up to the adoption decree which can be obtained from the record:

March 31, 1975: Juvenile court decree ordering termination.
April 10, 1975: Motion for new trial filed for Brenda.
April 23, 1975: Amended motion for new trial filed.
April 24, 1975: Motion for new trial overruled.
May 8, 1975: Notice of appeal to court of civil appeals.
December 31, 1975: Juvenile court decree affirmed by court of civil appeals.
January 14, 1976: Brenda's motion for rehearing posted by United States mail to the court of civil appeals; copies of such motion also mailed to the attorney for the Welfare Unit and the guardian *ad litem* for the children.
January 15, 1976: Letter from Welfare Unit to Brenda's attorney inquiring as to plans for appeal.
January 15, 1976: Someone representing the Welfare Unit purportedly checked with the clerk of the court of civil appeals and ascertained that no notice of appeal had been received.
January 16, 1976: Notice of appeal received by clerk of the court of civil appeals.
January 30, 1976: Entry of order overruling Brenda's motion for rehearing.
February 4, 1976: Hearing in Juvenile Court No. 1, Harris County, regarding adoption petition.
February 4, 1976: Entry of adoption decree by Juvenile Court No. 1, Harris County.

three months in the home of the adopting parents, that the children's relationship with the natural parents had been terminated, and that the adoption was in the best interest of the children.

■ The background circumstances were as follows: On March 31, 1975 the juvenile court had entered a judgment terminating the parent-child relationship. A timely motion for new trial was made by Brenda and was overruled. Brenda properly appealed to the court of civil appeals and on December 31, 1975 such court delivered its opinion. Motion for rehearing was posted by United States mail on January 14, 1976 and received on January 16, 1976 by the clerk of the court of civil appeals. On January 14, 1976 copies of this motion were also mailed to the attorney for the Welfare Unit and the guardian *ad litem* for the children. Therefore, this motion was timely. Tex.R. Civ.P. 4, 5, 458; *Smith v. Harris County-Houston Ship Chan. Nav. Dist.,* 160 Tex. 292, 329 S.W.2d 845 (1959). In the interim, on January 15, 1976, a letter was written by the Welfare Unit to the attorney for Brenda making inquiry as to plans for appeal. On this same date, January 15, 1976, inquiry was made with the court of civil appeals by an unnamed individual connected with the Welfare Unit ascertaining that no notice of appeal had been received. The court of civil appeals thereafter entered an order overruling the motion for rehearing on January 30, 1976 and application for writ of error was timely filed with the court of civil appeals on March 1, 1976. The adoption decree was entered on February 4, 1976, apparently without any further inquiry having been made relative to the finality of the judgment of the court of civil appeals. On February 4, 1976 the instant case was still being appealed and there did not exist a final determination that Bren-

da's relationship with her children should be terminated. Since this fact situation requires that there exist a termination decree before a petition for the adoption of these children can be considered [Section 16.03(b)[8]], the juvenile court exceeded its statutory authority and the adoption decree is therefore void. *Cline v. Niblo,* 117 Tex. 474, 8 S.W.2d 633, 638 (1928). As such, it cannot cause this appeal to be moot.

As stated, the variance between the pleadings relied on by the Welfare Unit, which alleged Section 15.02(1)(D) [conduct which endangers the children] as a basis for termination, and the judgment of the trial court, which relied upon Section 15.02(1)(B) [voluntarily left the children without expressing an intent to return], has not been made an issue before this court. Nevertheless, it was the burden of the Welfare Unit to prove each element of the provisions which formed the basis for the juvenile court's judgment. *Herrera v. Herrera,* 409 S.W.2d 395 (Tex.1966).

The elements of Section 15.02(1)(B) are as follows: (1) Brenda voluntarily left her children; (2) without expressing an intent to return; (3) without providing for the adequate support of the children; and (4) remained away for a period of at least three months. In addition to the elements of Section 15.02(1)(B), the Welfare Unit also had to prove the element of Section 15.02(2) that termination of the parent-child relationship was in the best interest of the children. *Wiley v. Spratlan,* 543 S.W.2d 349 (Tex.1976).

As Brenda contends that there is no evidence to sustain any of the juvenile court's findings, this court in reviewing the evidence in the record can consider only the evidence and the inferences tending to support the findings of the juvenile court and

---

**8.** Section 16.03, Texas Family Code Annotated, originally enacted in 1973, was amended effective September 1, 1975. The references herein to Section 16.03 pertain to the statute as amended in 1975. Section 16.03 provides in part:

"(b) Except as provided in Subsection (c) of this section, no petition for adoption of a child may be considered unless there has

been a decree terminating the parent-child relationship as to each living parent of the child or unless the termination proceeding is joined with the proceeding for adoption.

"(c) If a parent is presently the spouse of the petitioner, no termination decree is required with respect to the parental rights of that parent."

must disregard all evidence and inferences to the contrary. *Garza v. Alviar,* 395 S.W.2d 821 (Tex.1965). Since this case involves the right of children to the benefit of the home and environment which will probably best promote their interest and of the right of the parent to surround the children with proper influences, *Herrera v. Herrera, supra, Legate v. Legate,* 87 Tex. 248, 28 S.W. 281 (1894), it will be strictly scrutinized. *Wiley v. Spratlan, supra.*

A careful examination of the record before this court reveals no evidence that Brenda left her children without expressing an intent to return and, accordingly, the remaining no evidence points regarding the other necessary elements are not reached.[9] Beth Stephenson, the case worker for the Welfare Unit, was the only person to testify, other than Brenda, who had personal knowledge of the events surrounding the return of the children to the Welfare Unit in November 1974. This witness, Beth Stephenson, offered no testimony which related in any way to the subject of whether or not Brenda expressed an intent to return. This witness neither testified that Brenda, through action or words, expressed an intent to return, nor that Brenda failed to express an intent to return. The only testimony which related in any way to this subject was that of Brenda, who stated that when she phoned Beth Stephenson on November 20, 1974 she did not want her children to leave the home.

In its brief the Welfare Unit notes that the amended petition upon which the case was tried contained the allegation that Brenda endangered the emotional well-being of her children [Section 15.02(1)(B)]. The Welfare Unit contends that Brenda's failure to provide a home for the children, which forced them to live in the foster care of the Welfare Unit, endangered their emotional well-being. Applying the standard of review previously referred to, however, the record reveals no evidence of any nature that Brenda's conduct endangered, or would endanger, the emotional well-being of the children.

As there was no evidence that Brenda left her children without expressing an intent to return, we hold that the courts below erred in finding such. We also hold there was no evidence to support the allegation that Brenda endangered the emotional well-being of her children and therefore the termination decree cannot be sustained on that ground.

The judgments of the trial court and the court of civil appeals are reversed. In view of the inadequacy of the record and the injection of the interests of other individuals as a result of the attempted adoption, the cause is remanded for a new trial in the interest of justice.

---

9. The juvenile court found that the children had been left with the Welfare Unit for three months; "namely, part of November, December 1975 [*sic*], January and part of February 1975." A review of the record reveals no evidence of any nature regarding the exact date this purported three-month period began or ended. Therefore, it is impossible to ascertain whether the children were indeed left with the Welfare Unit for three months. However, this point is not relied on by this court in reaching a decision.